J-A15029-23; J-A15030-23

2023 PA Super 268

| | | |
|---|---|---|
| IN RE: DRAVO LLC-DERIVATIVE CLAIMS AGAINST CARMEUSE LIME, INC., AND CERTAIN AFFILIATED ENTITIES | : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: ALL PLAINTIFFS REPRESENTED BY GOLDBERG, PERSKY & WHITE, P.C. | : : : | No. 1210 WDA 2022 |

Appeal from the Order Entered October 5, 2022
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): GD 20-010198

| | | |
|---|---|---|
| IN RE: DRAVO LLC - DERIVATIVE CLAIMS AGAINST CARMEUSE LIME, INC., AND CERTAIN AFFILIATED ENTITIES | : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: ALL PLAINTIFFS REPRESENTED BY SAVINIS, KANE & GALLUCCI, LLC | : : : | No. 1284 WDA 2022 |

Appeal from the Order Entered October 5, 2022
In the Court of Common Pleas of Allegheny County Civil Division at No(s):
G.D. 20-010198

BEFORE: MURRAY, J., McLAUGHLIN, J., and PELLEGRINI, J.*

OPINION BY McLAUGHLIN, J.:                    **FILED: DECEMBER 19, 2023**

Here we have an appeal in a proceeding to determine whether asbestos plaintiffs may pierce the corporate veil and hold Carmeuse Lime, Inc. and certain affiliated entities (together, "CLI") liable for the torts of Dravo

_____

* Retired Senior Judge assigned to the Superior Court.

Corporation ("Dravo"). Each of the asbestos plaintiffs filed a lawsuit against CLI as well as other defendants. The trial court severed the claims against CLI from each individual case and consolidated them into the instant proceeding.[1] The asbestos plaintiffs are in two groups: those represented by Goldberg, Persky & White, P.C. ("GPW Plaintiffs"), and those represented by Savinis, Kane & Gallucci, LLC ("SKG Plaintiffs"). The asbestos plaintiffs' cases against the remaining defendants in the individual actions continued in the individual actions.

The trial court granted summary judgment to CLI, holding that plaintiffs could not pierce the veil, and the asbestos plaintiffs appealed. We conclude that the court erred in granting summary judgment to CLI. The asbestos plaintiffs produced evidence that in practice CLI and Dravo acted as a single entity and that CLI used its control of Dravo to leave Dravo subject to the asbestos liabilities, take significant assets for itself, and leave Dravo with inadequate assets to satisfy foreseeable asbestos liabilities. We therefore reverse and remand.

### Factual History

A. **Dravo's Background and Insurance Policies**

Prior to October 19, 1998, Dravo was a publicly traded corporation. Stipulation of Undisputed Facts ("Undisputed Facts"), filed Dec. 3, 2021, at ¶ 4. It was "involved in a number of businesses involving heavy industry,"

---

[1] **See** Order Severing Claims Against [CLI] and Transferring Them to Commerce and Complex Litigation Center, dated Sept. 24, 2020.

including manufacturing watercraft and industrial heating equipment and providing construction and engineering services in steel mills, chemical plants, and other industrial settings. *Id.* at ¶ 5. Since at least the early 1990s, Dravo had been sued in a number of lawsuits that sought damages due to alleged bodily injury caused by exposure to asbestos, where the exposure typically occurred during its operations from the 1940s through the 1980s. *Id.* at ¶¶ 6-7.

Between 1971 and 1986, Dravo purchased primary liability insurance policies ("Primary Policies") from Liberty Mutual Insurance Company ("Liberty Mutual"). The policies provided coverage for the defense and resolution of asbestos claims. Dravo also obtained during that same period excess liability insurance from London Market insurers, providing similar coverage. *Id.* at ¶ 8.

In the early 1990s, Dravo and Liberty Mutual had a disagreement "over what constituted 'an occurrence' under the Primary Policies, as that term was to be applied in the context of asbestos-related bodily injury claims against Dravo." Supplemental Stipulation of Undisputed Facts ("Supplemental Stipulation"), at ¶ 11. They resolved the dispute "by agreeing to treat 'clusters' of asbestos-related claims as occurrences under those policies[.]" *Id.* They memorialized the agreement in 1996 in a written document. *Id.* Dravo and Liberty Mutual continued to have disagreements, and created another "cluster" for asbestos-related claims arising out of Allegheny County, Pennsylvania. *Id.* at ¶ 12. They also continued to disagree about the limits of

coverage applicable to each cluster. *Id.* Dravo and Liberty Mutual resolved the issues in a 2015 settlement regarding "Dravo's coverage for asbestos-related bodily injury claims under the Primary Policies." *Id.* Dravo received $8 million in insurance proceeds as part of the settlement.

As early as 2005, Dravo notified the excess insurers that the excess coverage could be implicated in the future. *Id.* at ¶ 13. "In a letter dated October 13, 2005, an attorney" for certain excess insurers "advised that those insurers were reserving their rights and defenses regarding Dravo's right to coverage under the Excess Policies for reasons that included (among others) issues regarding what may or may not constitute an 'occurrence' under the Excess Policies." *Id.* at ¶ 14.

### B. **CLI's Acquisition of Dravo and Dravo's Dissolution**

Previously, in 1998, CLI, a Belgian company specializing in the mining and sale of natural resources such as lime, sought to acquire Dravo to gain control of Dravo Lime Company. Undisputed Facts at ¶¶ 10. CLI formed a wholly owned subsidiary called DLC Acquisition Corporation ("DLCAC") for the purpose of acquiring Dravo. *Id.* at ¶ 11. When announcing plans for this acquisition, CLI and Dravo issued a "Joint Press Release" stating that they had "announced agreement on a merger[.]" *Id.* at ¶¶ 12-13. The press release explained that DLCAC, as the acquiring company, would make a cash tender offer for all outstanding stock of Dravo. *Id.* at ¶ 13. DLCAC ultimately acquired 100% of the shares of Dravo common stock. *Id.* at ¶ 14. An "Agreement and

Plan of Merger" that governed the process by which CLI acquired Dravo[2] stated explicitly that DLCAC merged into Dravo and ceased to exist.

> [U]pon DLCAC's purchase of the shares of Dravo, DLCAC 'shall be merged into [Dravo] and the separate existence of [DLCAC] shall thereupon cease, and [Dravo], as the surviving corporation in the Merger, shall by virtue of the Merger continue its corporate existence under the laws of the Commonwealth of Pennsylvania with all of its rights, privileges, immunities, powers, and franchises unaffected thereby.

*Id.* at ¶ 16 (alterations in original). The articles of merger were filed with the Pennsylvania Corporation Bureau, in October 1998, and DLCAC merged with and into Dravo, with Dravo being the surviving corporation. *Id.* at ¶ 18.

After the acquisition, Dravo continued to be named as a defendant in asbestos suits. It continued to have access to insurance coverage under the primary insurance policies "and presumably the Excess Policies for the purpose of defending and resolving [a]sbestos [c]laims." Undisputed Facts at ¶ 21.

Dravo determined in 2018 that it would dissolve. Trial Court Opinion, dated Oct. 3, 2022, at 5. CLI, as Dravo's sole shareholder, exercised its right to approve plans for termination. *Id.* It formed a new subsidiary, Dravo 2018 Inc. ("Dravo 2018"), to serve as a holding company for Dravo. *Id.* Dravo and Dravo 2018 then reorganized so that Dravo 2018 was the direct parent of Dravo. *Id.* CLI transferred all Dravo stock to Dravo 2018, making Dravo 2018 the direct parent of Dravo, and leaving CLI the direct parent of Dravo 2018.

---

[2] *Id.* at ¶ 15.

*Id.* Dravo – until then a corporation - then converted to a limited liability company. Subsequently, on July 5, 2018, it filed for dissolution. *Id.*

### C. **Dravo's Operations**

From 1998 until Dravo converted to a limited liability company in 2018, "every one of Dravo's corporate officers simultaneously were also officers or employees of CLI." *Id.* at ¶ 20. After CLI acquired Dravo, Dravo "ceased having employees of its own, and the people within CLI's corporate family who did Dravo-related work were employees of CLI or an affiliate of CLI other than Dravo." Supplemental Stipulation, at ¶ 1. Those individuals did not receive a salary or wages from Dravo for the work they performed on Dravo's behalf. *Id.* Therefore, from the 1998 until the time Dravo converted to a limited liability company, it had only corporate officers, and no employees. *Id.* at ¶ 2. Once it converted to a limited liability company, it had only a member and managers, no employees. *Id.* CLI does not have corporate minutes or similar records to show who served as its corporate officers between 1999 and 2002. *Id.* at ¶ 3.

Dravo's insurers contacted and communicated with people employed by CLI (or an affiliate other than Dravo) about coverage issues involving Dravo. *Id.* at ¶ 4-5. CLI's employees, and employees of its affiliates other than Dravo, "used CLI letterhead (or letterhead identifying a non-Dravo affiliate)" to correspond with third parties about Dravo. *Id.* Insurance consultants providing advice about Dravo's asbestos coverage contacted or communicated with people employed by CLI (or an affiliate other than Dravo). *Id.* at ¶ 6.

Email communications with insurers "routinely included a disclaimer" indicating the communication was only for "the recipient and that the communication was private and/or privileged and not intended for third parties." *Id.* at ¶¶ 7-8. Some contained address and contact information for the sender that listed CLI or an affiliate as the sender's workplace. *Id.*

Individuals who were officers of both CLI and Dravo ("or who otherwise acted on behalf of CLI and Dravo on an as-needed basis") "advised Dravo's insurers and/or insurance consultants that communications and notices regarding Dravo should be directed to individuals who acted on behalf of both CLI and Dravo[.]" *Id.* at ¶¶ 9-10. They communicated on behalf of Dravo through email addresses that included a CLI-related suffix, *i.e.*, "@carmeusena.com."

In communications about the negotiations for the 2015 settlement between Dravo and Liberty Mutual, a Dravo and CLI officer emailed that another individual "would attend for [CLI]." SKG's Response to CLI's Motion for Summary Judgment ("SKG's Response"), Exh. 13, Email from Kevin Whyte to Gregg Russell and Carl Brigada dated Dec. 3, 2014. Emails show that during the negotiations, Liberty Mutual understood that a settlement with Dravo could be reached only if CLI approved it. SKG's Response, Dep. of Bruce Inglis, dated July 10, 2019, Exh. 15, Email from Barrett Breitun to David Young dated Sept. 6, 2018. In contrast to the emails, Dravo's corporate representative testified that Dravo did not need CLI's approval to reach the settlement. SKG's Response, Exh. 17, N.T., Dep. Of Kevin Whyte, July 18, 2019, at 139-140.

D. **Transactions Between Dravo and CLI**

Until 2007, Dravo Lime remained a wholly owned subsidiary of Dravo. Stipulation of Facts at ¶ 22. At some point before 2002, it changed its name to Carmeuse Lime & Stone, Inc. ("CLS"). *Id.* at ¶ 23. CLI and CLS "engaged in the same type of business operations . . . namely, . . . lime and limestone compan[ies] that owned equipment, quarries, and mines and conducted operations to service various customers." *Id.* at ¶ 24. In 2007, "Dravo obtained an appraisal of the value of CLS from McCrory and McDowell, LLC, an independent accounting and consulting firm." *Id.* at ¶ 25. CLS appraised for a fair market value of $249,300. *Id.*

After the appraisal, Dravo's directors by Unanimous Written Consent of the Board of Directors' dated July 26, 2007, which approved Dravo's sale of all of the issued and outstanding shares of common stock of CLS (as well as another wholly-owned subsidiary of Dravo, Carmeuse Lime Sales Corporation) to CLI pursuant to a 'Stock Purchase Agreement.'" *Id.* at ¶ 26. The Unanimous Written Consent stated that entering into the Stock Purchase Agreement would be in Dravo's best interest. *Id.* Similarly, CLI's directors executed an "'Action by Unanimous Written Consent of the Board of Directors' dated July 31, 2007 which approved CLI's purchase of all of the issued and outstanding shares of common stock of CLS from Dravo pursuant to a 'Stock Purchase Agreement.'" *Id.* at ¶ 27. The Unanimous Written Consent also stated that entering into the Stock Purchase Agreement would be in CLI's best interest. *Id.* at ¶ 27. Dravo and CLI then entered into a Stock Purchase Agreement

pursuant to which CLI agreed to acquire all outstanding shares of the common stock of CLS and Carmeuse Lime Sales Corporation. *Id.* at ¶ 28. In exchange, CLI would pay $249,300 "by delivery to Dravo of a 'Demand Note.'" *Id.* CLI then issued to Dravo a "Demand Note" dated August 31, 2007 in the amount of $249,300. *Id.* at ¶ 29. The demand note "bore interest at the lowest Applicable Federal Rate as defined in Section 1274(d) of the Internal Revenue Code." *Id.*

Dravo's directors then executed an "Action by Unanimous Written Consent of the Board of Directors," dated the same day as the demand note, wherein it "authorized and declared 'a special dividend in the amount of $235,300,000 . . . payable to [CLI] out of profits and surplus of the Corporation.'" *Id.* at ¶ 30. It also cancelled the Demand Note and the delivery of the same to CLI 'in exchange for a promissory note made by [CLI] in favor of [Dravo] in the aggregate principal amount of $14,000,000[.]'" *Id.* (alteration in original). The CLI directors also executed an "Action by Unanimous Consent" that same day where it "authorized CLI to 'deliver to Dravo a promissory note in the principal amount of $14,000,000 . . . in exchange for the cancellation and return of the Demand Note." *Id.* at ¶ 31.

In 2009, the Chief Financial Officer discovered that CLI owed Dravo $144 million, dating back to the 1998 merger. He discovered this by reviewing the 1999 tax return. SKG's Response, Exh. 21, N.T. of Dep. Of Bruch Inglis, Dec. 15, 2021, at 22, 25. The CFO was unsure which CLI entity owed Dravo the money and removed the debt by issuing a dividend to CLI in the amount of

$126 million, testifying that he did so because it "tidie[d] up the books." *Id.* at 21-26, 91.

### E. Post-Dissolution Events

After Dravo filed for dissolution in 2018, Dravo LLC remained subject to claims or lawsuits filed within two years of the date it dissolved, July 13, 2018. Dravo petitioned the trial court for a determination of the amount and form of security for "payment of claims that are reasonably expected to arise after the date of dissolution[.]" 15 Pa.C.S.A. § 8876(a); *see In re Dravo LLC Subchapter G Dissolution*, No. 893 WDA 2020, 2021 WL 5176403, at *2 (Pa.Super. Nov. 8, 2021). After the dissolution but before the two-year deadline, asbestos claimants against Dravo – similarly to this case, captioned as "All Claimants Represented by Savinis, Kane, & Gallucci, LLC and Goldberg, Persky, & White, P.C." – alleged in that proceeding that Dravo had more than $100 million in excess coverage. *See In re Dravo LLC Subchapter G Dissolution*, 2021 WL 5176403, at *2, *5; R. 1a-14a. Dravo ultimately settled with the excess insurers for $7 million. *Id.* [3]

### Procedural Background

The GPW and SKG Plaintiffs filed asbestos-related claims more than two years after Dravo LLC's dissolution. They claimed, among other things, that

---

[3] In that proceeding, Dravo also filed a petition for court approval of the settlement agreement it had reached with the excess insurance carriers. On appeal of the order approving the settlement agreement, this Court remanded for the trial court to issue a supplemental opinion explaining why it approved the settlement notwithstanding the claims that Dravo potentially had $100 million in insurance coverage. *Id.* at *5. The parties settled after the remand.

CLI should be liable for Dravo's asbestos liabilities under a corporate veil piercing theory. In September 2020, the trial court severed Plaintiffs' claims from the underlying actions and consolidated them into the instant proceeding.

CLI moved for summary judgment arguing, among other things, the Plaintiffs were unable to establish that the corporate veil should be pierced. The GPW Plaintiffs filed a counter-motion for summary judgment arguing there was no genuine issue of material fact regarding DLCAC's absolute identity with CLI. The trial court granted CLI's motion and denied the GPW Plaintiffs' motion. The GPW Plaintiffs and SPK Plaintiffs separately appealed.

## Issues

The SGK Plaintiffs raise the following issues:

> A. Whether the Trial Court erred by placing undue weight on the four-part test from which was explicitly supplanted by the twopart test based in equity that was established as precedent **Lumax Indus. v. Aultman** by the Pennsylvania Supreme Court in **Mortimer v. McCool**?
>
> B. Whether the Trial Court erred in applying the wrong standard at summary judgment by resolving factual disputes under the **Lumax** factors, thereby usurping the role of the jury at trial?
>
> C. Whether the Trial Court erred in ruling that no fraud or injustice occurred as a matter of law, despite the requirement that the Court view the evidence in the light most favorable to the non-moving party when Plaintiffs offered various disputed and stipulated facts showing fraud and injustice?

SGK Plaintiffs' Br. at 4.

The GPW Plaintiffs raise the following issues:

1. Did the [trial] court err by failing to find that no genuine issue of material fact existed in relation to evidence of record in this matter that [CLI] had such unity of interest and ownership with [DLCAC] that the separate personalities of the two corporations did not exist when DLCAC merged with [Dravo], with the Court therefore denying [GPW Plaintiffs'] Counter-Motion for Partial Summary Judgment?

2. Did the [trial] court err by failing to find that a genuine issue of material fact existed in relation to evidence of record in this matter that CLI had such unity of interest and ownership with DLCAC that the separate personalities of the two corporations did not exist when DLCAC merged with Dravo, with the Court therefore granting . . . CLI's Motion for Summary Judgment?

3. Did the [trial] court err by failing to find that the evidence of record in this matter demonstrated a genuine issue of material fact in relation to whether the Court would promote injustice if it found as a matter of law that it should adhere to DLCAC's corporate fiction and determine that CLI had not in fact merged with Dravo, with the Court therefore granting . . . CLI's Motion for Summary Judgment?

GPW Plaintiffs' Br. at 4.

## Whether Plaintiffs Can Assert the Corporate Veil Piercing Theory

Before turning to the Plaintiffs' claims, we will address CLI's argument that corporate veil piercing is a remedy, not an independent cause of action, and "is only available to impose liability already legally established by judgment against the entity whose veil is sought to be pierced." CLI's Br. at 16. CLI maintains that because Dravo dissolved, the Plaintiffs "do not and can never have viable causes of action against Dravo," and their bid to pierce the veil and hold CLI liable necessarily fails. *Id.*

CLI relies on *Commonwealth v. Golden Gate National Senior Care*, 194 A.3d 1010 (Pa. 2018). There, the Office of the Pennsylvania Attorney

- 12 -

General ("OAG") sued multiple nursing homes and their parent companies, alleging violations of the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"). The OAG sought to pierce the corporate veil to reach the parent companies and requested damages for unjust enrichment. *Id.* at 1015. The Commonwealth Court sustained preliminary objections and dismissed the suit in its entirety. The Pennsylvania Supreme Court found the UTPCPL claims were adequately pleaded, but concluded that the unjust enrichment claim was premature. *Id.* at 1012.

It is the Court's discussion of unjust enrichment and piercing the corporate veil that is relevant here. The OAG had alleged that "the parent companies received the allegedly improper payments, and it [sought] to pierce the corporate veil so as to recover these sums." *Id.* at 1034. The Court pointed out that because the UTPCPL claims were based on alleged misconduct by the nursing homes, the OAG's efforts to impose liability on their parents would be "necessary only in the event that it obtains a judgment against the [f]acilities that the [f]acilities cannot satisfy." *Id.* at 1035. The Court explained that "[a] request to pierce the corporate veil is not an independent cause of action, but rather is a means of imposing liability established in an underlying cause of action, such as tort or breach of contract, against another." *Id.* The Court thus affirmed the dismissal, but did so "without prejudice to raise it at a later date in an action to enforce any judgment obtained if the circumstances so require." *Id.*

*Golden Gate* is inapposite. It did not address a situation such as this case presents, where the parent corporation allegedly dissolved the entity against which "an underlying cause of action" would be asserted. Courts' "decisions are to be read against their facts[.]" ***Tincher v. Omega Flex, Inc.***, 104 A.3d 328, 398 (Pa. 2014). As discussed below, piercing the corporate veil is an equitable principle, that applies when justice so requires. ***See id.*** We conclude that in cases such as this, where a parent is alleged to have dissolved the entity against which a lawsuit would be filed, a plaintiff can press a claim against the parent.[4]

### **Whether the Court Erred in Granting Summary Judgment to CLI**

The GPW Plaintiffs and SGK Plaintiffs make two arguments in support of piercing the veil to reach CLI. First, they claim that since 1998, CLI and Dravo have not operated as separate companies, but, rather, that CLI and Dravo have been acting as one entity such that the corporate veil should be pierced.

---

[4] The dissent concludes that the plaintiffs' claims are barred by the statute of limitations, because the claims were not raised within two years of Dravo's filing of a certificate of dissolution. This conclusion is based on 15 Pa.C.S. § 1979(a)(2). That provision, by its terms, provides that so long as an action or proceeding is brought before or within two years of the dissolution of a business corporation, the dissolution "shall not eliminate nor impair any remedy available to or against the corporation." Here, the defendant is CLI, not Dravo, so no remedy is being sought against the dissolved corporation. As discussed above, no case prevents a court from piercing the corporate veil where a parent is alleged to have dissolved an entity against which a claim would have been asserted.

Second, they claim that CLI controlled DLCAC such that CLI, not DLCAC, merged with Dravo in 1998.[5]

"[S]ummary judgment is only appropriate in cases where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." ***Nicolaou v. Martin***, 195 A.3d 880, 891 (Pa. 2018) (citing Pa.R.C.P. 1035.2(1)). "When considering a motion for summary judgment, the trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party and must resolve all doubts as to the existence of a genuine issue of material fact against the moving party." ***Id.*** We reverse a grant of summary judgment if there has been an error of law or an abuse of discretion. ***Id.*** at 892. Because the issue of whether there is a genuine issue of material fact is a question of law, our standard of review is *de novo* and our scope of review is plenary. ***Id.***

### A. <u>The Veil Piercing Test</u>

The Pennsylvania Supreme Court recently discussed the doctrine of piercing the corporate veil in ***Mortimer v. McCool***, 255 A.3d 261 (Pa. 2021). In ***Mortimer***, the Court set forth a two-part inquiry for courts to use to determine when to pierce the corporate veil:

---

[5] In their responses to summary judgment in the trial court, each group of plaintiffs incorporated the response of the other group of plaintiffs. ***See*** GPW Plaintiffs' Response to CLI's Motion for Summary Judgement, dated Jan. 10, 2022, at 9, 10 (incorporating SKG Plaintiffs' response); SKG Plaintiffs' Response to CLI's Motion for Summary Judgment, dated Jan. 12, 2023, at 1 n.1 (incorporating the GPW Plaintiffs' Response).

> First, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, and second, adherence to the corporate fiction under the circumstances would sanction fraud or promote injustice[.]

*Id.* at 286-87 (citation omitted).

The parties here dispute whether in *Mortimer*, the Supreme Court supplanted a test previously used to determine whether a court should pierce the corporate veil, which had been outlined in *Lumax Industries, Inc. v. Aultman*, 669 A.2d 893 (Pa. 1995). In *Lumax*, the Supreme Court had "cited favorably the Commonwealth Court's enumeration of factors relevant to the piercing inquiry: 'undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs[,] and use of the corporate form to perpetrate a fraud.'" *Mortimer*, 255 A.3d at 268 (quoting *Lumax*, 669 A.2d at 895).

Here, the trial court applied the *Mortimer* two-part inquiry, but used the *Lumax* factors to determine whether Plaintiffs had met the first inquiry. The GPW and SKG Plaintiffs argue the Supreme Court Majority rejected the *Lumax* test, and claim that by requiring that they meet the *Lumax* test, the trial court increased the burden of proof. They note fraud is not required under *Mortimer* but is required under *Lumax*. They argue that in *Mortimer* the Supreme Court looked to avoid multi-faceted tests.

CLI argues that the trial court properly applied the veil-piercing test and found that neither of the *Mortimer* elements could be satisfied. It further

argues that ***Mortimer*** did not supersede prior case law, but rather harmonized them into a test with simpler articulation.

In ***Mortimer*** the question at issue was "[w]hether . . . the Supreme Court should adopt the 'enterprise theory' or 'single entity' theory of piercing the corporate veil to prevent injustice when two or more sister companies operate as a single corporate combine?" ***Id.*** at 272. The Court concluded that "a narrow form of . . . 'enterprise liability' may be available under certain circumstances." ***Id.*** at 266. In discussing the case's procedural history, it noted that the trial court had applied the ***Lumax*** factors to determine whether it should pierce the corporate veil. ***Id.*** at 269. The Court stated that "[t]hough these principles scan well enough, they are themselves a veil of sorts, obscuring the difficulty of applying them predictably and fairly from one case to the next." ***Id.*** at 268. It further noted that this Court had "observed that there appears to be no clear test or settled rule in Pennsylvania . . . as to exactly when the corporate veil can be pierced." ***Id.*** (alteration in original). The Court later stated that "Pennsylvania has resisted the temptation to formalize the inquiry with an ever-increasing number of predefined factors embodying the many considerations that might aid in determining whether the corporate form has been abused." ***Id.*** at 286. However, in discussing the law for piercing the corporate veil, the Court noted that the ***Lumax*** factors were the "[o]ft-cited factors that might lead a court to disregard the corporate form." ***Id.*** at 278.

The Court then discussed the law regarding enterprise liability in Pennsylvania and in other jurisdictions, and ultimately concluded that such liability can exist in Pennsylvania. *Id.* at 277-286. The Court then stated the two-part inquiry for courts to use to determine when to pierce a corporate veil:

> First, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, and second, adherence to the corporate fiction under the circumstances would sanction fraud or promote injustice.

*Id.* at 286-87 (citation omitted). It clarified that "[t]he second element – that there be fraud, wrong, or injustice—seems to be nothing more than a restatement of the basic starting point that piercing is an equitable remedy used to prevent injustice." *Id.* at 287 (citation and ellipses omitted). The Court stated that the fraud and injustice element tells a court when to pierce the veil and the control element "tells it against whom" it should be pierced. *Id.* (citation omitted) (emphasis removed). Throughout the case, the Court emphasized a corporate veil should be pierced only where there is great injustice and inequity. *See, e.g.*, *id.* at 281, 284. Further, regarding the enterprise liability doctrine, the Court stated that "it remains for the lower courts in future cases to consider its application consistently with the approach described above, in harmony with prior case law, mindful of the salutary public benefits of limited liability, and with an eye always toward the interests of justice." *Id.* at 288.

In sum, although the Supreme Court distilled the corporate veil piercing law into a two-prong inquiry, Pennsylvania's prior case law regarding the doctrine, including cases applying the ***Lumax*** factors, remain good law and can be used to determine whether the veil should be pierced in a particular case. Although all ***Lumax*** factors may not be needed or relevant in each piercing the veil case, courts may still look to those factors, and the cases that applied them, for guidance when determining whether the ***Mortimer*** inquiry is met. We further note that although the ***Lumax*** factors and prior case law continue to be relevant following ***Mortimer*** to determine whether a court should pierce the corporate veil, a plaintiff need not prove fraud to establish piercing is appropriate, even though fraud is listed as a ***Lumax*** factor. The Pennsylvania Supreme Court has stated that "[f]raud in its narrow sense need not be shown." ***Mortimer***, 255 A.3d at 278 (citations omitted). Rather, "Pennsylvania courts will disregard the corporate form 'whenever it is necessary to avoid injustice,' and so long as 'the rights of innocent parties are not prejudiced nor the theory of corporate entity rendered useless.'" ***Id.*** (citations omitted); ***see Fletcher-Harlee Corp. v. Szymanski***, 936 A.2d 87, 96 (Pa.Super. 2007) (quoting ***Village at Camelback Prop. Owners Assn. Inc. v. Carr***, 538 A.2d 528, 532-33 (Pa.Super. 1988), and noting corporate existence can be disregarded without a showing of fraud).

## B. **Applying the *Mortimer* Test**

We will next address whether the trial court erred in granting CLI's summary judgment motion. The SKG Plaintiffs allege that the evidence relied

on by the trial court depends on the credibility of individuals who were receiving a salary from CLI, "but on the other hand allegedly performing work for Dravo." SKG Plaintiffs' Br. at 24. They argue the trial court essentially issued findings of fact, which is improper at the summary judgment stage. As an example, they cite the court's conclusion that CLI went through the proper steps to ensure it was separate from Dravo, which the SKG Plaintiffs allege was a contested issue of fact. They further contend there was evidence that the corporate formalities were not followed.

The SKG Plaintiffs provide facts they argue prove unity of interest and ownership, including, among other things, that Dravo had no employees or physical location; the officers for each company had identical titles; corporate formalities were not upheld for the first four years; Dravo used CLI letterhead; and confidentiality existed between CLI and Dravo. They further claim that neither company had board meetings, but rather took actions by unanimous written consent. They point out that communications were sent on Dravo's behalf from CLI email addresses, with someone testifying it would be impractical to have different email addresses for CLI's 30 different United States affiliates. The SKG Plaintiffs further note that Dravo's communications were often signed by individuals in their capacity as CLI officers.[6] They further

---

[6] The SKG Plaintiffs further claim that a confidentiality agreement directed that all notices for Dravo should be sent to CLI's attorney. We are unable to find this confidentiality agreement in the certified record. In its brief, SKG Plaintiffs cite page 310 of the reproduced record, which is their response to
*(Footnote Continued Next Page)*

point out that the insurance companies communicated with CLI and claim the insurance companies thought the coverage was for CLI. They assert CLI was making the decisions during the negotiations with the insurance companies, noting documents and testimony support a finding that Dravo needed approval from CLI for the settlement. The SKG Plaintiffs contend that at a minimum a factfinder should have reviewed the evidence and made the factual findings.

The SKG Plaintiffs next contend the court erred in finding no fraud or injustice occurred. They claim the wrong and injustice in this case includes the intermingling of corporate and personal interests, the fraudulent transfer of a $250 million asset to CLI for $14 million, the waiver of a debt of $129 million owed by CLI, CLI and Dravo committing PUFTA violations, and the waiver of more than $100 million in excess insurance coverage. They claim the intermingling was "egregious with [CLI] reaching into Dravo's coffers repeatedly, and removing hundreds of millions of dollars for [CLI's] benefit – and to Dravo's detriment." SKG Plaintiffs' Br. at 53 (emphasis omitted). They claim CLI did not want Dravo to have value when the insurance ran out.[7]

_____

CLI's motion for summary judgment. That page includes a quotation from page 3 of the confidentiality agreement, but does not state where that agreement can be found in the certified record.

[7] The GPW Plaintiffs focus on whether DLCAC had a separate identity than CLI, arguing that it did not and therefore Dravo merged with CLI in 1998, not DLCAC. Because we agree with the SKG Plaintiffs that the actions of CLI and Dravo following the 1998 merger create genuine issues of material fact preventing summary judgment on the issue of piercing the corporate veil, we do not reach this issue.

The trial court found the Plaintiffs had not established that the corporate veil should be pierced. It found Dravo and CLI were separate personalities. Trial Court Opinion, dated Oct. 3, 2022, at 6. It pointed out the corporations were legally separate entities, as Dravo was acquired in a reverse triangular merger, noting that the benefit of this type of merger is that the parent company acquires the target entity's ownership interests, without assuming any of the liability. *Id.* It then discussed whether they remained separate and distinct, applying the *Mortimer* factors to determine whether the corporate veil should be pierced. *Id.* at 7. In addressing the first factor, the court applied the four-factor test from *Lumax* – undercapitalization, failure to adhere to corporate formalities, intermingling of corporate and personal affairs, and use of corporate form to perpetuate a fraud. *Id.* It reasoned these factors help expand on the first *Mortimer* factor. *Id.*

The court found Dravo was not undercapitalized, as it maintained the insurance to manage the asbestos claims. *Id.* It pointed out that the majority of Dravo's business was managing asbestos claims, which it used the insurance proceeds and capital from accounts receivable to do. *Id.* It further noted that when Dravo sold CLS to CLI, it retained $14 million for operating expenses. *Id.*

The trial court also found that Dravo adhered to corporate formalities. *Id.* at 8. The court stated that Dravo had "separate slates of officers and directors and separate financial records and accounts," and maintained its own corporate records and minutes book. *Id.* It reasoned that although "every

officer and director of Dravo . . . was simultaneously an officer or employee of [CLI], Dravo . . . still adhered to corporate formalities necessary for the two entities to be treated as separate." *Id.* The court further found the entities "respected corporate formalities during [CLI's] acquisition of CLS." *Id.* It pointed out that CLI had CLS appraised by a third party and executed facially valid payment notes in exchange, which were voted on and approved by CLI's board. *Id.* Further, Dravo's board voted on and approved the action cancelling the note in consideration for a new note for operating costs. *Id.* The court reasoned that although "these actions occurred on the same day, and had the effect of transferring CLS to [CLI], corporate formalities were adhered to." *Id.*

The court next found "there [was] no intermingling of corporate or personal affairs." *Id.* It found the corporate affairs of CLI and Dravo were "intentionally and consciously separated," reasoning they had separate boards of directors, financial records, and minutes, and had different business goals. *Id.* It stated that "[CLI] reaped financial benefits from Dravo . . . much like any corporate parent in a similar situation." *Id.* at 9. The court further found there was no use of the corporate form to perpetuate fraud. *Id.* It reasoned that "Pennsylvania common law recognizes that it is not fraudulent for investors to take steps to wind-down a failing business venture." *Id.* It reasoned Dravo was a failing business that "had managed asbestos liabilities for two decades," and it was within its right to dissolve. *Id.* It found there was no evidence of fraudulent activity, noting that Dravo settled with its insurance

policies before dissolving and had $7 million to cover asbestos liabilities for the two-year period following dissolution. *Id.*

The court also found Plaintiffs could not establish that a corporate action would promote fraud or other injustice. It noted that Pennsylvania common law recognizes that shielding personal assets is a legitimate use of the corporate form. *Id.* at 11. It reasoned that CLI "consciously executed a specific type of merger in order to shield itself from Dravo['s] asbestos liabilities," and "comported to the letter of the law in their acquisition, management, and dissolution of Dravo." *Id.* It pointed out that CLI maintained Dravo for two decades, making Dravo's primary business the management of asbestos related liabilities, and it made sure it retained an amount sufficient to cover any claims filed in the two-year period following dissolution. *Id.*

We conclude the trial court erred in finding there were no genuine issues of material fact. We will first address the first prong of the *Mortimer* test, whether CLI and Dravo had such unity of interest and ownership that the separate personalities of the corporations no longer exist. We conclude there is a genuine issue of material fact regarding this factor. Dravo had no employees and no place of business. When conducting business on Dravo's behalf, individuals often used CLI email addresses and letterhead. Further, emails suggest that Dravo's insurance carrier believed CLI had to approve any settlement it reached with Dravo. Moreover, there is evidence that CLI received financial benefit from Dravo, purchasing Dravo's subsidiary and then immediately receiving a large shareholder dividend from Dravo and receiving

a large payment to release it of a debt owed to Dravo. This evidence, among other things, could lead a fact finder to conclude that CLI and Dravo had such a unity of interest that separate personalities no longer existed. **Mortimer**, 255 A.3d at 278 (noting that where an owner intermingles personal and corporate interests, "it is not the courts who first decline to recognize the corporate form. Rather, when the shareholder derives improper personal gain or advantage by misusing the corporate form, the court may reach through the veil already torn by the owner's abuses").

Although under the paperwork, the companies may have adhered to corporate formalities, the evidence above raises a genuine issue as to whether those formalities continued in practice. Further, the money transfers and the communications from CLI on behalf of Dravo and the suggestion that Dravo required CLI's approval for settlement raise a question as to whether the companies intermingled their affairs. In addition, that Plaintiffs did not establish that Dravo was undercapitalized or that a fraud had been committed would not preclude piercing the corporate veil. Rather, they are only two factors that a court may consider. Further, although Dravo allegedly had sufficient funds to pay claims raised in the two-year period following dissolution, the money transfers and settlement with the insurance carriers raise questions about its capitalization and about whether a fraud occurred. **See Fletcher-Harlee Corp.**, 936 A.2d at 100-03 (applying the **Lumax** factors and other factors, finding some factors met and others not met, and concluded that "justice and equity require[d] that [the shareholder] be held

liable for the judgment obtained by" plaintiff, finding the shareholder "failed to adhere to corporate formalities, and . . . at least to some extent, intermingled his personal and corporate affairs" and concluding evidence supported conclusion shareholder "disregarded the separate legal status of Delmarva, thus further rendering Delmarva's corporate form to be a sham"); ***Lomas v. Kravitz***, 130 A.3d 107, 128 (Pa.Super. 2015) (*en banc*) (finding court did not err in piercing the corporate veil where the company was undercapitalized, the shareholder failed to adhere to corporate formalities, there was intermingling of funds, and shareholder used the corporate form to perpetuate a fraud, "specifically, to remove assets from the reach of creditors," and including in the facts that the various companies loaned money to each other or the shareholder and wrote off various debts owed by the companies).[8]

Next, we address whether adherence to the corporate fiction under the circumstances would sanction fraud or promote injustice. We conclude that a genuine issue of material fact as to this prong also exists. The Plaintiffs do not need to establish fraud under this factor, rather we must determine whether piercing the corporate veil "is necessary to avoid injustice."

---

[8] The SKG Plaintiffs further allege that the transfers violated the Pennsylvania UTPCPL and therefore would qualify as a fraud. Because we concluded there is sufficient evidence to create a genuine issue of material fact regarding piercing with corporate veil regardless whether the transactions violated the UTPCPL, we do not determine whether a violation occurred.

Here, the large money transfers and the settlement with insurance carriers for potentially significantly less than the insurance value, leaving Dravo with only limited insurance proceeds to address the asbestos claims, raises a genuine issue of material fact as to whether CLI and Dravo were promoting an injustice. Although a reverse-triangular merger can be proper, where the parent and the subsidiary in practice function as a single entity, and the parent uses its control of the subsidiary to take the subsidiary's assets and leave the subsidiary without sufficient assets to satisfy foreseeable liabilities, the corporate veil can be pierced.

Order reversed. Case remanded. Jurisdiction relinquished.

Judge Pellegrini joins the opinion.

Judge Murray files a dissenting opinion.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 12/19/2023