**[J-79A-2025 and J-79B-2025]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | |
|---|---|
| IN RE:  DRAVO LLC-DERIVATIVE CLAIMS AGAINST CARMEUSE LIME, INC., AND CERTAIN AFFILIATED ENTITIES | :  No. 33 WAP 2024<br>:<br>:  Appeal from the Order of the<br>:  Superior Court entered December<br>:  19, 2023, at No. 1210 WDA 2022, |
| APPEAL OF: CARMEUSE LIME, INC., AND CERTAIN AFFILIATED ENTITIES | :  Reversing the Order of the Court of<br>:  Common Pleas of Allegheny County<br>:  entered October 5, 2022, at<br>:  No. GD-20-010198, and remanding.<br>:<br>:  ARGUED:  October 7, 2025 |
| IN RE: DRAVO LLC-DERIVATIVE CLAIMS AGAINST CARMEUSE LIME, INC., AND CERTAIN AFFILIATED ENTITIES | :  No. 34 WAP 2024<br>:<br>:  Appeal from the Order of the<br>:  Superior Court entered December<br>:  19, 2023, at No. 1284 WDA 2022, |
| APPEAL OF: CARMEUSE LIME, INC., AND CERTAIN AFFILIATED ENTITIES | :  Reversing the Order of the Court of<br>:  Common Pleas of Allegheny County<br>:  entered October 5, 2022, at<br>:  No. GD-20-010198, and remanding.<br>:<br>:  ARGUED:  October 7, 2025 |

<u>**OPINION**</u>

**JUSTICE BROBSON**                    **DECIDED: MAY 22, 2026**

The Pennsylvania Uniform Limited Liability Company Act of 2016 (LLC Act or Act)[1] provides a mechanism for Pennsylvania limited liability companies to dissolve and wind up their activities and affairs.[2]  This statutory process allows a dissolved limited liability

---

[1] 15 Pa. C.S. §§ 8811-8898.

[2] The dissolution and winding up provisions of the LLC Act are set forth in Subchapter G of the Act, 15 Pa. C.S. §§ 8871-8878.

company (LLC) to "publish notice of its dissolution and request persons having claims against the company to present them in accordance with the notice." 15 Pa. C.S. § 8875(a). Generally, claims that are not presented to the LLC within two years of this notice are barred by statute. *Id.* § 8875(c).

Here, we are asked to determine whether plaintiffs who filed tort claims against a dissolved LLC that are otherwise time barred pursuant to the LLC Act may nevertheless pursue those claims under the theory that the plaintiffs can pierce the protective veil of the LLC to recover against the LLC's surviving parent company. After careful review, we hold that the equitable remedy of veil piercing is not available to the plaintiffs under these circumstances. Because the Superior Court reached the opposite result, we reverse that court's judgment.

## I. FACTUAL BACKGROUND[3]

Prior to October 19, 1998, Dravo Corporation (Dravo) was a publicly owned corporation organized pursuant to the laws of the Commonwealth of Pennsylvania with its principal place of business in Pittsburgh. Dravo had existed since the late 1880s, and, over the decades prior to 1998, Dravo engaged in a number of businesses involved in heavy industry. Beginning in at least the early 1990s, a number of plaintiffs sued Dravo, alleging asbestos-related injuries (Asbestos Claims). These Asbestos Claims typically were based on allegations of exposure to asbestos during Dravo's operations from the 1940s through the 1980s.

"Between 1971 and 1986, Dravo purchased a number of primary liability insurance policies from Liberty Mutual Insurance Company that provided coverage for, among other things, the defense and resolution of Asbestos Claims . . . ." (Stipulation of Undisputed Facts, 12/3/2021, ¶ 8.) "Dravo also purchased excess liability insurance from certain

---

[3] The parties stipulated to the facts underlying this matter. A full summary of those facts is unnecessary to the disposition of this appeal.

London Market insurers [(Excess Policies)] during that period, which Dravo contended also provide coverage for, among other things, the costs of defending and resolving Asbestos Claims . . . ." (*Id.*)

In 1998, Carmeuse Lime, Inc. (CLI), was part of a privately owned family of companies based in Belgium. "CLI specialized in the mining and sale of lime and other minerals and natural resources in the United States." (*Id.* ¶ 9.) In 1998, CLI wished to acquire Dravo in an effort to gain control of Dravo's lime operation, Dravo Lime Company (DLC). To accomplish this objective, CLI formed a wholly owned subsidiary, which it named DLC Acquisition Corporation (DLCAC). DLCAC ultimately acquired at least 80% of Dravo's outstanding shares of common stock. "On October 26, 1998, articles of merger were filed with the Pennsylvania Department of State's Corporation Bureau [(Corporation Bureau)] whereby DLCAC was merged with and into Dravo, with Dravo being the surviving corporation."[4] (*Id.* ¶ 18.)

Following CLI's acquisition of Dravo, suits against Dravo continued for Asbestos Claims and Dravo had access to its insurance coverage for resolving those claims, including the Excess Policies. Dravo, however, ceased having employees and, instead, had only corporate officers. "[T]he people within CLI's corporate family who did Dravo-related work were employees of CLI or an affiliate of CLI other than Dravo." (Supplemental Stipulation of Undisputed Facts, 1/12/2022, ¶ 1.) The same remained true after Dravo converted from a corporation to an LLC in 2018—*i.e.*, Dravo continued to have no employees, just a sole member and managers.

From 1998 to August 31, 2007, DLC, which changed its name to Carmeuse Lime & Stone, Inc. (CLS), in 2002, remained a wholly owned subsidiary of Dravo. Thereafter,

---

[4] This process is referred to as a "reverse-triangular merger." A "reverse-triangular merger" is defined as a "merger in which the acquiring corporation's subsidiary is absorbed into the target corporation, which becomes a new subsidiary of the acquiring corporation." *Merger*, Black's Law Dictionary 1182 (12th ed. 2024).

"[i]n 2007, Dravo obtained an appraisal of the value of CLS from . . . an independent accounting and consulting firm. The appraisal report indicated that CLS had a fair market value of $249,300,000." (Stipulation of Undisputed Facts, 12/3/2021, ¶ 25.) Dravo and CLI subsequently agreed that CLI would acquire all of Dravo's issued and outstanding shares of CLS common stock, as well as another of Dravo's wholly owned subsidiaries, Carmeuse Lime Sales Corporation. Dravo and CLI further agreed that CLI would pay Dravo $249,300,000 in connection with such acquisition by delivery of a demand note.

Eventually, in 2018, CLI approved plans for Dravo's termination and formed a new subsidiary, Dravo 2018, Inc. (Dravo 2018), to act as a holding company for Dravo. Dravo and Dravo 2018 subsequently reorganized, and CLI transferred Dravo's stock to Dravo 2018, making Dravo 2018 the direct parent of Dravo and leaving CLI as the direct parent of Dravo 2018. Dravo then converted from a corporation to an LLC.

## II. PROCEDURAL HISTORY

### A. LLC Dissolution Proceedings[5]

On July 5, 2018, Dravo filed for dissolution pursuant to Subchapter G of the LLC Act by filing a certificate of dissolution with the Corporation Bureau. Dravo provided notice of the dissolution to all known claimants. *See* 15 Pa. C.S. § 8874. Regarding potential unknown claimants and consistent with Section 8875(a) of the Act, Dravo published notice of its dissolution on July 13, 2018. *See id.* § 8875(a). In that dissolution notice, Dravo advised persons having any claims against it to present such claims in the manner outlined in the notice. *See id.* Dravo further advised that a claim would be forever barred

---

[5] The majority of the facts set forth in this Section II.A are gleaned from the documents of record filed with the Allegheny County Court of Common Pleas (trial court) in Dravo's dissolution proceedings, docketed at GD No. 18-010151. This Court may take judicial notice of these facts pursuant to Pennsylvania Rule of Evidence 201(b)(2). Pa.R.E. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

unless an action to enforce the claim was commenced within two years of the date of publication of the dissolution notice. *See id.* § 8875(c). There is no allegation that this dissolution notice was defective. Indeed, the trial court concluded that the dissolution notice met the requirements of Section 8875 of the Act and that Dravo's publication of such notice established a claim bar date of July 13, 2020. *See* Order ¶ 19, *In re Dravo LLC Subchapter G Dissolution* (Allegheny Cnty. Ct. of Common Pleas, GD No. 18-010151, filed August 31, 2023).

Consequently, Dravo remained subject to only those third-party claims that were filed by the July 13, 2020 claim bar date. *See* 15 Pa. C.S. § 8875(c). Pursuant to Section 8876(a) of the LLC Act, Dravo filed an application with the trial court to commence proceedings "for a determination of the amount and form security to be provided for payment of claims that [were] reasonably expected to arise after the date of dissolution." 15 Pa. C.S. § 8876(a). Notably, the LLC Act did not require Dravo to provide security "for any claim that [was] or [was] reasonably anticipated to be barred under [S]ection 8875(c)" of the Act. *Id.* § 8876(b).

Hundreds of asbestos claimants, not including the claimants at issue in this appeal, asserted Asbestos Claims against Dravo by the July 13, 2020 claim bar date. In an effort to satisfy those Asbestos Claims, as well as any unknown Asbestos Claims that would be filed before the July 13, 2020 claim bar date, Dravo negotiated a settlement with the providers of its Excess Policies, pursuant to which the insurance providers agreed to pay Dravo $7 million in exchange for full and final settlement of their obligations to provide coverage under the Excess Policies. As part of the settlement, Dravo also agreed that it would republish notice of the July 13, 2020 claim bar date and publish notice of the settlement by providing: (1) actual notice to all known claimants; and (2) publication notice to all unknown claimants. On July 17, 2020, after conducting multiple evidentiary

hearings and considering the evidence and the parties' arguments relative to the adequacy of the settlement,[6] the trial court approved the settlement. In so doing, the trial court concluded that Dravo satisfied the publication and re-publication requirements of the settlement agreement.[7]

On July 17, 2020, the same date that it approved the settlement, the trial court also entered a case management order, which set forth the procedure that the court and parties would follow to establish the amount and form of security that Dravo was required to provide in accordance with Section 8876 of the LLC Act. *See id.* § 8876. Although not explicitly stated, it appears that the trial court treated the $7 million settlement as the security. *See* Order ¶ 15 (Allegheny Cnty. Ct. of Common Pleas, GD No. 18-010151, filed July 17, 2020) ("For the orderly and efficient administration of justice, and in light of the provisions of Subchapter G [of the Act], which require this [c]ourt to determine the amount and form of security for the payment of claims that are reasonably expected to arise after the date of dissolution based on facts known to Dravo and to ensure the necessary assets of Dravo are available to provide such security, this [c]ourt assumes exclusive *in rem* jurisdiction over the [settlement proceeds]."). Throughout the ensuing years and with oversight by the trial court, Dravo resolved all timely filed Asbestos Claims, except those where the asbestos claimants had not returned the required releases.

---

[6] The asbestos claimants asserted that Dravo had more than $100 million in coverage under the Excess Policies and requested time to perform discovery to determine whether Dravo had received the best settlement possible from its insurance providers.

[7] Several asbestos claimants appealed the trial court's order approving the settlement to the Superior Court. In response, the Superior Court, *inter alia*, remanded the matter to the trial court with instructions to provide a supplemental opinion explaining its reasons for approving the settlement. *In re Dravo LLC Subchapter G Dissolution* (Pa. Super., No. 893 WDA 2020, filed November 8, 2021). It appears, however, that the parties resolved their disagreement over the settlement agreement after the remand, and the asbestos claimants discontinued their appeal. *In re Dravo LLC*, 307 A.3d 146, 152 n.3 (Pa. Super. 2023).

Indeed, on August 31, 2023, the trial court entered a final order in the dissolution proceedings, wherein it stated, *inter alia*, that Dravo "ha[d] paid and discharged or made adequate provision for all debts, obligations and other liabilities . . . such that any remaining property [could] be distributed to its member and [that] Dravo [was] permitted to file its certificate of termination [with the Corporation Bureau] in accordance with Section 8872(f) of the [LLC] Act," 15 Pa. C.S. § 8872(f).  Order ¶ 34, *In re Dravo LLC Subchapter G Dissolution* (Allegheny Cnty. Ct. of Common Pleas, GD No. 18-010151, filed August 31, 2023).  The trial court further highlighted that no claimant "described in Section 8875(c) [of the Act] commenced an action against Dravo before the July 13, 2020 [claim] bar date."  *Id.* ¶ 31.  In addition, the trial court reported that it "entered orders enforcing the July 13, 2020 [claim] bar date and barring untimely claims."  *Id.* ¶ 32.  As such, the trial court "relinquishe[d] jurisdiction over Dravo and any of its remaining assets."  *Id.* ¶ 38.  Importantly, there was no evidence or allegation presented to the trial court in the dissolution proceedings that Dravo failed to pay any valid Asbestos Claims that were filed before the July 13, 2020 claim bar date.

### B.  Subsequent Lawsuits

More than two years after the July 13, 2020 claim bar date, multiple plaintiffs (Plaintiffs) initiated separate, asbestos-related actions against numerous defendants, including CLI and Dravo (Subject Actions).  The Subject Actions included claims that were based upon the proposition that CLI should be responsible for Dravo's asbestos liabilities under a veil-piercing theory.  Upon CLI's motion, the trial court severed Plaintiffs' claims implicating veil-piercing theories from the Subject Actions and consolidated those veil-piercing claims into one docket.  Based upon stipulated facts, the trial court ultimately granted summary judgment in favor of CLI, reasoning that Plaintiffs failed to present

sufficient evidence to pierce Dravo's protective veil. Plaintiffs appealed to the Superior Court, which reversed and remanded in a two-to-one published opinion.

The Superior Court began its analysis by considering CLI's position that veil piercing is a remedy, not an independent cause of action. Relying on *Commonwealth v. Golden Gate National Senior Care LLC*, 194 A.3d 1010 (Pa. 2018) (*Golden Gate*), CLI argued that veil piercing is available only to impose liability already established by judgment against the entity whose veil is sought to be pierced. "CLI maintain[ed] that[,] because Dravo dissolved, . . . Plaintiffs do not and can never have viable causes of action against Dravo, and their bid to pierce the veil and hold CLI liable necessarily fails." *In re Dravo LLC*, 307 A.3d at 153 (citation and internal quotation marks omitted). The Superior Court, however, found *Golden Gate* to be inapposite, as "[i]t did not address a situation such as this case presents, where the parent corporation allegedly dissolved the entity against which 'an underlying cause of action' would be asserted." *Id.* at 154.

Next, the Superior Court addressed Plaintiffs' claim that the trial court erred by granting summary judgment in favor of CLI. Plaintiffs' argument was two-fold. "First, they claim[ed] that[,] since 1998, CLI and Dravo have not operated as separate companies[] but, rather, that CLI and Dravo have been acting as one entity such that the corporate veil should be pierced. Second, they claim[ed] that CLI controlled DLCAC such that CLI, not DLCAC, merged with Dravo in 1998." *Id.* After explaining the appellate court standard for reviewing an order granting summary judgment, which we discuss below, the Superior Court summarized the law that governs the concept of piercing the corporate veil.

In so doing, the Superior Court stated that, in *Mortimer v. McCool*, 255 A.3d 261 (Pa. 2021), this Court announced a two-part inquiry for courts to utilize when called upon to determine whether a corporation's veil can be pierced: "First, there must be such unity of interest and ownership that the separate personalities of the corporation and the

individual no longer exist, and[,] second, adherence to the corporate fiction under the circumstances would sanction fraud or promote injustice[.]" *Id.* at 155 (second alteration in original) (quoting *Mortimer*, 255 A.3d at 286-87). According to the Superior Court, the parties disagreed as to whether *Mortimer* replaced a previous test that was outlined by this Court in *Lumax Industries, Inc. v. Aultman*, 669 A.2d 893 (Pa. 1995) (*Lumax*). The Superior Court expressed that, in *Lumax*, this Court "cited favorably the Commonwealth Court's enumeration of factors relevant to the piercing inquiry: undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs[,] and use of the corporate form to perpetrate a fraud." *Id.* (alteration in original) (citation and internal quotation marks omitted).

The Superior Court resolved the parties' disagreement, reasoning that, "although the [*Mortimer*] Court distilled the corporate veil piercing law into a two-prong inquiry, Pennsylvania's prior case law regarding the doctrine, including cases applying the *Lumax* factors, remain good law and can be used to determine whether the veil should be pierced in a particular case." *Id.* at 156. The Superior Court further noted that, "although the *Lumax* factors and prior case law continue to be relevant following *Mortimer* to determine whether a court should pierce the corporate veil, a plaintiff need not prove fraud to establish piercing is appropriate, even though fraud is listed as a *Lumax* factor." *Id.* According to the Superior Court, this Court has stated that "[f]raud in its narrow sense need not be shown." *Id.* (alteration in original) (quoting *Mortimer*, 255 A.3d at 278). "Rather," the Superior Court explained, "Pennsylvania courts will disregard the corporate form whenever it is necessary to avoid injustice, and so long as the rights of innocent parties are not prejudiced nor the theory of corporate entity rendered useless." *Id.* (internal quotation marks omitted) (quoting *Mortimer*, 255 A.3d at 278).

The Superior Court then applied the *Mortimer* test and concluded that the trial court erred by entering summary judgment in favor of CLI. In this regard, the Superior Court initially determined that a genuine issue of material fact exists as to whether CLI and Dravo had such unity of interest and ownership that the separate personalities of the companies no longer existed. In support, the Superior Court highlighted various aspects of the business relationship between Dravo and CLI. Specifically, the court noted:

> Dravo had no employees and no place of business. When conducting business on Dravo's behalf, individuals often used CLI email addresses and letterhead. Further, emails suggest that Dravo's insurance carrier believed CLI had to approve any settlement it reached with Dravo. Moreover, there is evidence that CLI received financial benefit from Dravo, purchasing Dravo's subsidiary and then immediately receiving a large shareholder dividend from Dravo and receiving a large payment to release it of a debt owed to Dravo. This evidence, among other things, could lead a fact finder to conclude that CLI and Dravo had such a unity of interest that separate personalities no longer existed.
>
> Although under the paperwork, the companies may have adhered to corporate formalities, the evidence above raises a genuine issue as to whether those formalities continued in practice. Further, the money transfers and the communications from CLI on behalf of Dravo and the suggestion that Dravo required CLI's approval for settlement raise a question as to whether the companies intermingled their affairs. In addition, [the fact] that Plaintiffs did not establish that Dravo was undercapitalized or that a fraud had been committed would not preclude piercing the corporate veil. Rather, they are only two factors that a court may consider. Further, although Dravo allegedly had sufficient funds to pay claims raised in the two-year period following dissolution, the money transfers and settlement with the insurance carriers raise questions about its capitalization and about whether a fraud occurred.

*Id.* at 159 (citations omitted).

Next, the Superior Court held that a genuine issue of material fact exists as to whether adherence to the corporate fiction under the circumstances would sanction fraud or promote injustice. In this regard, the Superior Court opined:

> Here, the large money transfers and the settlement with insurance carriers for potentially significantly less than the insurance value, leaving

Dravo with only limited insurance proceeds to address the asbestos claims, raises a genuine issue of material fact as to whether CLI and Dravo were promoting an injustice. Although a reverse-triangular merger can be proper, where the parent and the subsidiary in practice function as a single entity, and the parent uses its control of the subsidiary to take the subsidiary's assets and leave the subsidiary without sufficient assets to satisfy foreseeable liabilities, the corporate veil can be pierced.

*Id.* at 160. For these reasons, the Superior Court reversed the trial court's order granting summary judgment in favor of CLI and remanded the matter to the trial court for further proceedings.

Judge Murray authored a dissenting opinion. Judge Murray expressed that "[t]he Legislature has created a process whereby a dissolved [LLC] can bar future claims, thus cutting off the possibility that the [LLC's] potential liability could never be completely resolved." *Id.* at 161 (Murray, J., dissenting). Judge Murray continued that "the Legislature expressly, plainly, and repeatedly set a two-year limitation for actions brought against dissolved [LLCs]." *Id.* at 162. Because Plaintiffs filed the Subject Actions after that two-year period expired, Judge Murray would have concluded that Plaintiffs' claims are time barred. *Id.* (emphasis omitted). For this reason, Judge Murray would have affirmed the trial court's order granting summary judgment in favor of CLI.

## III. ISSUES

This Court granted allowance of appeal to consider the following issues, as phrased by CLI:

a. Was it an error of law to find that tort claims based on the alleged conduct of a lawfully dissolved LLC, which are expressly barred by Pennsylvania's LLC dissolution statute, can be revived and asserted against the LLC's parent through piercing the LLC's corporate veil?

b. Was it an error of law to find that the "promote injustice" element of Pennsylvania's veil-piercing standard can be met when a lawfully dissolved subsidiary is left without sufficient assets to address its purported "foreseeable asbestos liabilities," which are barred as a result of subsidiary's lawful dissolution?

*In re Dravo LLC*, 330 A.3d 391 (Pa. 2024) (per curiam).

## IV. PARTIES' ARGUMENTS[8]

### A. CLI's Arguments[9]

CLI begins its argument by reminding the Court of the "general rule . . . that a corporation shall be regarded as an independent entity even if its stock is owned entirely by one person." (CLI's Brief at 23 (quoting *Lumax*, 669 A.2d at 895).) CLI adds that "the law recognizes a narrow exception to the principles of corporate separateness and limited liability where an entity's 'corporate veil' can be pierced and its liabilities imposed on its parent company or shareholder." (*Id.* at 24.) Relying on this Court's decision in *Mortimer*, CLI reports that "veil piercing is a 'restrained' equitable remedy, not an 'independent cause of action.'" (*Id.* (citations omitted).)

According to CLI, "[a] veil-piercing analysis . . . starts with whether there is a legally viable cause of action or legally enforceable judgment against a subsidiary." (*Id.*) CLI then summarizes several decisions from our sister states and contends that these opinions reveal that other states recognize that veil piercing is not a cause of action; rather, it is a method of recovering damages caused by the corporation at issue. CLI takes the position that the Superior Court ignored this fundamental principle, given the absence of underlying liability on Dravo's part.

In support, CLI emphasizes that Plaintiffs are attempting to utilize veil piercing to recover damages from CLI for the alleged tortious acts of its former subsidiary, Dravo. CLI submits, however, that Dravo had lawfully dissolved and the two-year claim bar had expired before Plaintiffs filed their claims. Consequently, CLI argues, those claims are barred by the LLC Act. In this regard, CLI insists that the LLC Act clearly and

---

[8] The issues presented in this case are interrelated. We, therefore, summarize and address them together.

[9] The Chamber of Commerce of the United States of America, the Pennsylvania Chamber of Business and Industry, and the Pennsylvania Coalition for Civil Justice jointly filed an *amicus* brief in support of CLI.

unambiguously provides that, "[w]hen an LLC dissolves and publishes a notice of its dissolution alerting potential claimants that they must assert a claim against the LLC within two years, the [s]tatute explicitly directs that claims filed more than two years after the notice's publication are 'barred.'" (*Id.* at 28-29 (citing 15 Pa. C.S. § 8875(c)).)

In CLI's view, veil piercing cannot be utilized to circumvent the LLC Act. Indeed, CLI highlights that, when "Plaintiffs filed their lawsuits, the entity whose veil they [sought] to pierce—Dravo—no longer existed because of its dissolution, and there were no legally viable claims to be asserted against it because the two-year window within which to bring them had closed." (*Id.* at 31.) CLI further suggests that veil piercing is inappropriate in this case because Plaintiffs do not have a judgment against Dravo and, therefore, cannot demonstrate any liability against Dravo.

CLI submits that the LLC Act's "two-year period for asserting claims against a dissolved entity reflects the Legislature's judgment that the dissolved entity—and its members and corporate relatives—should be free from liability after the legislatively determined period of time." (*Id.* at 34 (internal quotation marks omitted) (quoting *Dubose v. Quinlan*, 173 A.3d 634, 644 (Pa. 2017)).) CLI argues that this clear legislative goal should not be ignored in the pursuit of some sort of equity. In other words, according to CLI, equity cannot circumvent the LLC Act's two-year claim bar. CLI then summarizes various decisions from other jurisdictions that, in CLI's view, refused to pierce the corporate veils of dissolved corporations after the pertinent claim bar dates.

Next, CLI suggests that "the Superior Court found that veil piercing could be used to impose Dravo's extinguished liabilities on CLI merely because CLI allegedly had dissolved Dravo and Plaintiffs had named CLI as a defendant." (*Id.* at 38-39.) According to CLI, this principle is not recognized by law. In support, CLI shares, *inter alia*, that: (1) Section 8871(a)(2) of the LLC Act allows the member of a single-member LLC to

dissolve the LLC; (2) "there is no concept of a 'wrongful dissolution' under the [LLC Act] or the case law;" (3) "the record . . . refutes any characterization of Dravo's dissolution, CLI's purported involvement in the decision to effectuate it, or the trial court's approval of it, as improper;" and (4) "the Superior Court's conclusion that a parent's mere involvement in its subsidiary's dissolution is enough to justify veil piercing would subject a parent, shareholder, or LLC member . . . to 'indefinite[] liab[ility] for its former subsidiary's' liabilities 'virtually whenever a parent corporation chose to dissolve its subsidiary[.]'" (*Id.* at 39, 40, 41 (some alterations in original) (quoting *BLH, Inc. v. United States*, 13 Cl. Ct. 265, 274 (1987)).)

CLI then takes aim at the Superior Court's conclusion "that veil piercing's 'injustice' requirement could be met where a parent company's 'tak[ing]' of its subsidiary's assets leaves the subsidiary unable to 'satisfy foreseeable liabilities.'" (*Id.* at 44 (alteration in original).) CLI argues that this standard runs contrary to the LLC Act and "should not be adopted because, in practice, it is unworkable, [is] unfair, and creates unpredictable liability exposure." (*Id.*) In this regard, CLI submits that the Superior Court failed to define what constitutes the "'taking' of assets by a parent company" and a "foreseeable liability." (*Id.*) CLI further asserts that "no Pennsylvania court has ever held that an entity's inability to satisfy liabilities alone constitutes an injustice" for purposes of a veil-piercing analysis. (*Id.* at 45.) "Indeed," CLI opines, "equating the mere inability to pay with an 'injustice' that can support veil piercing leaves the 'injustice' requirement without boundaries." (*Id.* at 46.) For these reasons, CLI asks this Court to reverse the Superior Court's judgment.

## B. Plaintiffs' Arguments[10]

Plaintiffs emphasize that the veil-piercing doctrine is firmly grounded in equity and that the test announced in *Mortimer* applies to all varieties of abuses of the corporate structure, including the abuse that CLI perpetrated in utilizing Dravo to insulate CLI from liability. According to Plaintiffs, "the evidence that [CLI] ignored any distinction between it and Dravo is overwhelming." (Plaintiffs' Brief at 39.) Plaintiffs, therefore, submit that they "met the first prong of *Mortimer* by establishing that Dravo did not exist separate and apart from [CLI]." (*Id.*)

Turning to *Mortimer*'s second prong, Plaintiffs offer three examples of injustice present in this case. First, Plaintiffs argue that, in *Mortimer*, this Court "held that[,] when two companies blur the lines between themselves, they are mixing personal and corporate interests, and they are piercing their own corporate veil." (*Id.* at 40 (emphasis omitted).) Plaintiffs maintain that "the intermingling of corporate and personal interests was unbelievably egregious with [CLI] reaching into Dravo's coffers repeatedly, removing hundreds of millions of dollars for [CLI's] benefit—and to Dravo's detriment." (*Id.* (emphasis omitted).) Plaintiffs then provide factual support for this claim.

For example, Plaintiffs point out that, in 1998, Dravo owned DLC, which was later renamed CLS in 2002. Plaintiffs continue that, in 2007, CLS was valued at $249,500,000; yet, that same year, Dravo sold CLS to CLI for $14 million. Plaintiffs suggest that, "[t]o create a paper trail, the two 'companies' alleged that the sale was for $249 million, and then Dravo simply issued a dividend to [CLI] for $235 million within five days of the sale, effectively making the purchase of a $249 million . . . asset for a little more than $14 million." (*Id.* at 42-43.) According to Plaintiffs, not only is this transfer a sufficient injustice to pierce Dravo's protective veil, but it also violates Section 5104 of the

---

[10] The Pennsylvania Association for Justice and the American Association for Justice jointly submitted an *amicus* brief in support of Plaintiffs.

Pennsylvania Uniform Fraudulent Transfer Act (PUFTA), 12 Pa. C.S. § 5104, and proves fraud. (*Id.* at 43.) Plaintiffs then discuss how they believe PUFTA was violated in this case.

Regarding their second injustice, Plaintiffs explain that, in 2009, CLI and Dravo's new chief financial officer discovered that CLI owed Dravo $144 million, dating back to the 1998 merger. Plaintiffs maintain that, "[d]espite the fact that this $144 million debt had been owed to Dravo since the 1998 merger, [CLI]/Dravo decided in 2009 to remove the debt . . . [by issuing] a dividend to [CLI] for $126 million . . . , effectively reducing the $144 million debt owed to Dravo by $126 million." (*Id.* at 49.) Plaintiffs take the position that this maneuver "was about removing another asset from which creditors could seek payment from Dravo when its insurance ran out." (*Id.*) According to Plaintiffs, "[a]bsent unity of interest and ownership, no company would waive such an incredible debt for any reason." (*Id.*)

As to their third injustice, Plaintiffs express that Dravo had more than $100 million in insurance from the Excess Policies. Plaintiffs state that, as part of Dravo's dissolution proceedings, "[CLI] settled with Dravo's insurance companies, reducing more than $100 million of coverage to just $7 million." (*Id.* at 50.) Based upon these circumstances, Plaintiffs argue that CLI "made every effort to prevent Dravo's creditors, the asbestos victims, from receiving just compensation not only by siphoning hundreds of millions of dollars out of Dravo, but also by depleting the insurance assets." (*Id.* at 50-51.)

Putting it all together, Plaintiffs suggest that "[t]he actions behind all three injustices began with a 2005 letter by Dravo's excess insurance carriers, disputing that they owed coverage due to the settlements that Dravo had with its primary insurer regarding 'an occurrence.'" (*Id.* at 51.) "As of 2005," Plaintiffs continue, "Dravo had millions of dollars' worth of primary insurance coverage that would last several more years. However, as

of 2005, [CLI] was put on notice that the hundreds of millions of dollars of excess coverage may disappear without litigation over the coverage." (*Id.*) "Thus" in Plaintiffs' view, "[CLI] engaged in a multi-year conspiracy to remove all assets from Dravo before the primary insurance coverage was exhausted." (*Id.* at 51.)

Plaintiffs also maintain that CLI offers a misinterpretation of this Court's precedent to support its position. In this regard, Plaintiffs contend that our case law does not require them to have a judgment against Dravo to pierce its protective veil. Rather, Plaintiffs submit that, "in *Golden Gate*[,] this Court held that veil piercing is unnecessary if recovery may be had against a target defendant's subsidiary." (*Id.* at 53 (emphasis omitted).) Plaintiffs insist that CLI's contention "mutates this rule into a mandate that veil piercing is available only where 'there is a legally viable cause of action or legally enforceable judgment against a subsidiary.'" (*Id.* (quoting CLI's Brief at 24).) Plaintiffs then further explain their position regarding CLI's argument:

> What [CLI] wants this Court to conclude is that[,] because Dravo dissolved, its corporate veil cannot be pierced because Plaintiffs can no longer sue Dravo. To the contrary, it is because [CLI] engineered the asset looting and dissolution of Dravo that piercing of Dravo's corporate veil is necessary to avoid injustice. To hold otherwise would be to encourage companies to mimic [CLI's] behind-the-scenes corporate plundering. Indeed, had Plaintiffs not opposed Dravo's dissolution, the hundreds of millions of dollars swindled from Dravo's assets never would have come to light. [CLI] acts as though corporate machinations are unassailable as long as i's are dotted and t's are crossed. Equity demands otherwise.

(*Id.* at 55-56 (emphasis omitted).)

In closing, Plaintiffs assert that, "[i]n requesting that this Court hold that the dissolution of Dravo acts as a shield protecting [CLI], [CLI] ignores the entire first prong of the *Mortimer* test." (*Id.* at 56.) Plaintiffs posit that the "facts establish that [CLI] was Dravo (and had been Dravo for many years) and that there was no actual Dravo to dissolve. To suggest that the filing of dissolution papers is a moat across which equity

cannot traverse, ignores that there was no distinction between Dravo and [CLI] that needs to be crossed." (*Id.* at 57 (emphasis omitted).) Plaintiffs are of the view that they "have presented sufficient facts from which a jury could easily determine that [CLI] either (1) completely and utterly controlled Dravo, or (2) that Dravo never existed following the 1998 merger." (*Id.*) "Accordingly," Plaintiffs contend, "filing paperwork to dissolve an entity that never existed, or one that never was not an independent corporate entity, violates the tenets that afford corporate entities the protections that [CLI] now seeks." (*Id.*) For these reasons, Plaintiffs ask this Court to affirm the Superior Court's judgment.

## V. ANALYSIS

Ultimately, we are asked to determine whether the trial court properly granted summary judgment in favor of CLI. Relevant to this matter, a trial court should enter an order granting summary judgment when "there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report." Pa.R.Civ.P. 1035.2(1). Our Rules of Civil Procedure dictate that "a motion for summary judgment is based on an evidentiary record that entitles the moving party to a judgment as a matter of law." *Fine v. Checcio*, 870 A.2d 850, 857 (Pa. 2005) (citing Pa.R.Civ.P. 1035.2 note). "In considering the merits of a motion for summary judgment, a court views the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." *Id.* A trial court "may grant summary judgment only where the right to such a judgment is clear and free from doubt." *Id.* "An appellate court may reverse the granting of a motion for summary judgment if there has been an error of law or an abuse of discretion." *Id.* at 857 n.3. Whether genuine issues of material fact exist presents a question of law; our standard of review, therefore, is *de*

*novo*. *Id*. Consequently, "we need not defer to the determinations made by the lower tribunals. Our scope of review . . . is plenary." *Id*.

Additionally, to the extent that our disposition of this appeal requires us to interpret the LLC Act, such a task is guided by the Statutory Construction Act of 1972, 1 Pa. C.S. §§ 1501-1991 (Statutory Construction Act). Section 1921(a) of the Statutory Construction Act provides that the "object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa. C.S. § 1921(a). "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa. C.S. § 1921(b). "As a general rule, the best indication of legislative intent is the plain language of a statute." *Malt Beverages Distribs. Ass'n v. Pa. Liquor Control Bd.*, 974 A.2d 1144, 1149 (Pa. 2009).

It is a time-honored jurisprudential maxim that equity follows the law. *See Rittenhouse v. Levering*, 6 Watts & Serg. 190, 198 (Pa. 1843) ("It is a general principle that equity follows the law, and where right does not exist at law, a Court of Chancery will not afford the party equitable relief."). Here, having failed to present their claims under the LLC Act by filing an action to enforce such claims against Dravo by the July 13, 2020 claim bar date, Plaintiffs invoke the equitable doctrine of veil piercing as a means of seeking compensation for the very same injuries. Regarding that doctrine, "[i]t is well established that a corporation is a distinct and separate entity, irrespective of the persons who own all its stock."[11] *Barium Steel Corp. v. Wiley*, 108 A.2d 336, 341 (Pa. 1954).

---

[11] As noted above, when Dravo dissolved, it was an LLC, not a corporation. This Court has never explicitly held that an LLC can be subject to veil piercing. We, however, implicitly determined in *Mortimer* that veil piercing applies to LLCs, as the *Mortimer* Court adopted the enterprise theory of veil piercing in the context of a judgment creditor attempting to pierce the protective veil of an LLC. *See*, *e.g.*, *Mortimer*, 255 A.3d at 268 (explaining that judgment creditor filed actions before Court seeking to pierce corporate veil of LLC). The *Mortimer* Court, nonetheless, utilized principles of corporation law to elucidate the concepts underlying the veil-piercing doctrine. The parties to this matter largely follow that lead, and we do the same.

"Incorporation . . . encourag[es] investment by enabling the risk averse to limit their risk of loss to their investment in the corporate entity; limiting liability through incorporation is not a bug of corporate law but its defining feature." *Mortimer*, 255 A.3d at 277 (alterations in original) (footnote, citation, and internal quotation marks omitted). "But limiting liability necessarily distributes risk to others. It externalizes business costs by imposing them upon creditors, for example." *Id.*

Consequently, when persons and entities establish corporations or LLCs, they "are not free to blur the lines of the capacity in which they act as it may suit them, and the courts must take care to maintain the necessary distinctions." *Id.* at 278 (citation omitted). "When an owner does otherwise, he effectively pierces the corporate veil by intermingling . . . personal interests with the corporation's interests." *Id.* (alteration in original) (citation and internal quotation marks omitted). "Understood in this way, it is not the courts who first decline to recognize the corporate form. Rather, when the shareholder derives improper personal gain or advantage by misusing the corporate form, the court may reach through the veil already torn by the owner's abuses." *Id.*

When a court is faced with determining whether the equitable doctrine of veil piercing is available to a plaintiff, the court "must start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception. Care should be taken on all occasions to avoid making the entire theory of corporate entity useless." *Id.* (citation omitted). Stated differently, "there is a strong presumption in Pennsylvania against piercing the corporate veil." *Lumax*, 669 A.2d at 895.

Nevertheless, this Court has "held that, whenever an owner or owners use control of a corporation to further their personal interests, the fiction of the separate corporate identity may be disregarded." *Mortimer*, 255 A.3d at 278. "The corporate veil will be

pierced and the corporate form disregarded whenever justice or public policy demand[,] such as when the corporate form has been used to defeat public convenience, justify wrong, protect fraud, or defend crime." *Golden Gate*, 194 A.3d at 1035 (alteration in original) (citations and internal quotation marks omitted). This Court has endorsed the following two-part standard for evaluating whether a plaintiff can pierce a corporation's veil of protection: "First, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, and[,] second, adherence to the corporate fiction under the circumstances would sanction fraud or promote injustice." *Mortimer*, 255 A.3d at 286-87 (citation omitted).

"Oft-cited factors that might lead a court to disregard the corporate form in a given case include undercapitalization, failure to adhere to corporate formalities,[12] substantial intermingling of corporate and personal affairs[,] and use of the corporate form to

---

[12] Given the language employed in Section 8106 of the Partnership Code, 15 Pa. C.S. § 8106, which, by its express terms, is applicable to LLCs, when a plaintiff seeks to pierce the protective veil of an LLC, this factor—*i.e.*, a failure to adhere to corporate formalities—weighs less, if at all. Section 8106, which is entitled "Failure to observe formalities," provides:

> The failure of a limited liability partnership, limited partnership, limited liability limited partnership, electing partnership or *limited liability company* to observe formalities relating to the exercise of its powers or management of its activities and affairs is not a ground for imposing liability on a partner, member or manager of the entity for a debt, obligation or other liability of the entity.

15 Pa. C.S. § 8106 (emphasis added). The comment to Section 8106 explains:

> This section pertains to the equitable doctrine of "piercing the veil"—*i.e.*, conflating an entity and its owners to hold one liable for the obligations of the other. The doctrine of "piercing the corporate veil" is well-established, and courts regularly (and sometimes almost reflexively) apply that doctrine to limited liability companies and other unincorporated entities. In the corporate realm, "disregard of corporate formalities" is a key factor in the piercing analysis. In the realm of limited liability companies, that factor is inappropriate, because informality of organization and operation is both common and desired.

15 Pa. C.S. § 8106 cmt. (citation omitted).

perpetrate a fraud." *Id.* at 278 (second alteration in original) (citation and internal quotation marks omitted). "Fraud in its narrow sense need not be shown; Pennsylvania courts will disregard the corporate form whenever it is necessary to avoid injustice, and so long as the rights of innocent parties are not prejudiced nor the theory of corporate entity rendered useless." *Id.* (footnote, citations, and internal quotation marks omitted).

Paramount to the instant matter, "[a] request to pierce the corporate veil is not an independent cause of action[] but[,] rather[,] is a means of imposing liability established in an *underlying cause of action*, such as tort or breach of contract, against another." *Golden Gate*, 194 A.3d at 1035 (emphasis added). Where a plaintiff seeks to pierce the corporate veil to impose a corporation or LLC's liabilities onto a parent entity or shareholder/member, at a bare minimum, the plaintiff must establish a viable cause of action exists against that corporation or LLC. In other words, if the plaintiff is unable to demonstrate that the corporation or LLC can face liability for the underlying cause of action, then the plaintiff cannot pierce the protective veil as a matter of law.[13] Our decision in *Golden Gate* helps to illustrate this point.

---

[13] *See*, *e.g.*, *Peacock v. Thomas*, 516 U.S. 349, 354 (1996) ("Piercing the corporate veil is not itself an independent . . . cause of action[] but[,] rather[,] is a means of imposing liability on an underlying cause of action." (citation and internal quotation marks omitted)); *Wallop Canyon Ranch, LLC v. Goodwyn*, 351 P.3d 943, 960 (Wyo. 2015) ("The determination of whether a fiduciary duty can be breached based on self[ ]dealing with related entities does not require veil-piercing analysis. This is because we do not consider veil[ ]piercing until the threshold question of whether there is liability for an underlying cause of action has been answered." (citation and internal quotation marks omitted)); *Vasquez v. Sportsman's Inn, Inc.*, 57 A.3d 313, 321 (R.I. 2012) ("[A]n attempt of a third party to pierce the corporate veil does not constitute a cause of action independent of that against the corporation; rather, it is an assertion of facts and circumstances that will persuade the court to impose the corporate obligation on its owners. It is a means of assessing liability for the acts of a corporation against an equity holder in the corporation. It is not itself an action but is merely a procedural means of allowing liability on a substantive claim." (quoting 18 Am. Jur. 2d *Corporations* § 47 at 694-95 (2004))); *see also* Kan. Stat. Ann. § 17-7101(a) ("When the officers, directors or stockholders of any corporation shall be liable by the provisions of this code to pay the debts of the (continued…)

In *Golden Gate*, the Office of Attorney General (OAG) filed suit against nursing homes and their parent companies, contending, *inter alia*, that the parent companies received improper payments. The OAG brought claims under the Unfair Trade Practices and Consumer Protection Law (UTPCPL),[14] as well as a claim for unjust enrichment. "The thrust of the OAG's argument in favor of its unjust enrichment claim [was] that the allegedly ill-gotten proceeds [had] been siphoned out of the [nursing homes] and passed on to the parent entities." *Golden Gate*, 194 A.3d at 1035. Stated differently, the OAG sought to pierce the nursing homes' corporate veils to gain access to the parent companies' coffers.

As noted above, the Court, in *Golden Gate*, explained that "[a] request to pierce the corporate veil is not an independent cause of action[] but[,] rather[,] is a means of imposing liability established in an underlying cause of action, such as tort or breach of contract, against another." *Id.* In applying this principle, the Court highlighted that "the UTPCPL claims [were] all based on alleged misconduct by the [nursing homes], either individually or chain-wide." *Id.* "Thus," the Court observed, "the OAG's efforts to impose liability on [the parent companies was] necessary only in the event that it obtain[ed] a judgment against the [nursing homes] that the [nursing homes could not] satisfy." *Id.* The Court then stated that, "[a]s this eventuality [had] not yet come to pass, the OAG's unjust enrichment claim [was] premature." *Id.*

Turning back to the instant matter, while Plaintiffs filed their asbestos-related claims by naming, among others, CLI as a defendant, Plaintiffs' claims are against Dravo, not CLI. More specifically, Plaintiffs allege that Dravo caused their asbestos-related

---

corporation, or any part thereof, any person to whom they are liable may have an action against any one or more of them. The petition in any such action shall state the claim against the corporation and the ground on which the plaintiff expects to charge the defendants personally.").

[14] Act of December 17, 1968, P.L. 1224, *as amended*, 73 P.S. §§ 201-1 to -10.

injuries, and they seek to pierce Dravo's protective veil to gain access to CLI's assets as the source of compensation for those injuries. (*See*, *e.g.*, Plaintiffs' Brief at 6 ("[B]ased on the information discovered in [Dravo's dissolution proceedings], . . . Plaintiffs filed suit against [CLI], alleging that [CLI] should be held liable for the past use of asbestos by Dravo through the equitable remedy of piercing the corporate veil.").) We, therefore, must determine, preliminarily, whether Plaintiffs can pursue their tort causes of action against Dravo. The LLC Act answers this question.

Section 8872(a) of the Act provides that a "dissolved [LLC] shall wind up its activities and affairs, and the [LLC] continues after dissolution only for the purpose of winding up." 15 Pa. C.S. § 8872(a). A dissolved LLC "may publish notice of its dissolution and request persons having claims against the [LLC] to present them in accordance with the notice." *Id.* § 8875(a). Pursuant to Section 8875(b)(3) of the LLC Act, such notice must "state that a claim against the [LLC] is barred unless an action to enforce the claim is commenced within two years after publication of the notice." *Id.* § 8875(b)(3). Importantly, Section 8875(c) of the Act provides that, if a dissolved LLC affords notice under Section 8875(b), then a claim is barred "unless the claimant commences an action to enforce the claim against the [LLC] within two years after the publication date of the notice," save for exceptions that are irrelevant to this appeal. *Id.* § 8875(c).

It is undisputed that, when Plaintiffs filed the Subject Actions and presented their asbestos claims in the trial court, Dravo had completed the court-approved dissolution process. It is also undisputed that Plaintiffs filed the Subject Actions after the July 13, 2020 claim bar date. Consequently, allowing Plaintiffs to pursue such claims against Dravo at this juncture would run contrary to the clear language of the Act. *See id.* § 8875(c). Indeed, Subchapter G of the LLC Act unambiguously evinces the General Assembly's intent to extinguish potential claims against an LLC at a specific point

in time. Because equity follows the law, Plaintiffs cannot benefit from the equitable remedy of veil piercing where the LLC Act forbids all claims filed against Dravo after the July 13, 2020 claim bar date.

We acknowledge that this result could be characterized as an "injustice" in a general sense. That injustice, however, is not the product of CLI or Dravo abusing Dravo's corporate or LLC status. Rather, this outcome stems from the General Assembly's policy decision to allow an LLC to dissolve for any or no reason, including to discharge ongoing liability,[15] and to limit the time to bring claims against the dissolved LLC to two years after the LLC publishes notice of its dissolution. While statutory claim bar dates may seem harsh to some, their existence and effect are no stranger to the law. *See*, *e.g.*, *Warrantech Consumer Prods. Servs., Inc. v. Reliance Ins. Co. in Liquidation*, 96 A.3d 346, 358 (Pa. 2014) ("As this Court has recognized, barring claims against insolvent insurers after a certain date, while it may work hardships on certain parties, is necessary to permit the Liquidator to manage effectively existing liabilities for the ultimate benefit of all claimants of insolvent insurers."); *Ellis v. Westinghouse Elec. Co., LLC*, 11 F.4th 221, 233 (3d Cir. 2021) ("Section 503 [of the federal Bankruptcy Code, 11 U.S.C. § 503,] thus provides both a carrot and a stick for creditors promptly to request payment of administrative expenses. File claims on time and, if valid, they will receive priority treatment in the bankruptcy and get paid in full under the plan. File the claims late and they will face discharge. The harsh result is justified because, like general claim bar dates for prepetition claims, bar dates for administrative expense claims help the debtors know their liabilities and implement a viable plan to obtain a fresh start.").

Finally, it is noteworthy that, despite Plaintiffs' insistence that CLI improperly raided Dravo's assets, Plaintiffs do not contend that these alleged raids had any impact on

---

[15] By way of example, the Act allows for the dissolution of an LLC simply "upon . . . [t]he consent of all the members." 15 Pa. C.S. § 8871(a)(2).

Dravo's ability to pay valid, timely Asbestos Claims brought against it before the July 13, 2020 claim bar date. Plaintiffs also fail to cite to any evidence that could demonstrate that, had they filed their claims against Dravo by the July 13, 2020 claim bar date, Dravo could not have paid those claims due to the alleged raids by CLI. Lastly, in the end, even if Dravo was flush with millions or billions of dollars' worth of assets after the July 13, 2020 claim bar date, Plaintiffs' untimely pursuit of their asbestos-related claims against Dravo would land them in the same position in which they currently find themselves—*i.e.*, without any causes of action against Dravo.

## VI. CONCLUSION

Plaintiffs initiated the Subject Actions claiming that Dravo caused their asbestos-related injuries after the LLC Act barred any such claims against Dravo, resulting in Plaintiffs having no underlying causes of action against Dravo. Consequently, as a matter of law, Plaintiffs cannot pursue the remedy of piercing Dravo's protective veil to seek compensation from CLI for their injuries. The Superior Court erred in holding otherwise. For these reasons, we reverse the Superior Court's judgment, which reversed the trial court's order granting summary judgment in favor of CLI.

Chief Justice Todd and Justices Donohue, Dougherty, Wecht, Mundy and McCaffery join the opinion.